[Cite as *DCWI Office N., L.L.C. v. Montgomery Cty. Aud.*, 195 Ohio App.3d 235, 2011-Ohio-4011.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

DCWI OFFICE NORTH, L.L.C.,     :

       :     Appellate Case No. 24262

     Appellant,     :

       :     Trial Court Case No. 10-CV-1022

v.     :

       :

MONTGOMERY COUNTY AUDITOR et al.,     :     (Civil Appeal from

       :      Common Pleas Court)

       :

     Appellees.     :

· · · · · · · · · · ·

O P I N I O N

Rendered on the 12th day of August, 2011.

· · · · · · · · · · ·

Richard Reiling, for appellant.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Laura G. Mariani, Assistant Prosecuting Attorney, for appellees Montgomery County Auditor et al.

Dwight A. Washington, for appellee Dayton City Schools.

…………..

FAIN, Judge.

{¶ 1} Plaintiff-appellant, DCWI Office North, L.L.C., appeals from a judgment affirming the Montgomery County Board of Revision's decision to leave the county auditor's valuation of real property unchanged for tax purposes. DCWI contends that the trial court erred in failing to find that the auditor breached its duties under R.C. Chapter 5713. DCWI

further contends that the trial court erred by disregarding the appraisal of DCWI's appraiser and by failing to conduct a hearing on valuation.

{¶ 2} We conclude that the trial court abused its discretion in affirming the decision of the board of revision. The county auditor indicated at the board of revision hearing that he preferred to use actual income in applying the income approach to valuation of the property. By submitting the evidence that the county auditor specifically prefers, DCWI met its burden of presenting probative evidence that the value of its property was an amount other than the value determined by the auditor. The trial court failed to consider the actual-income evidence when considering valuation, and the court's decision, therefore, was not within its discretion. Accordingly, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

I

{¶ 3} In March 2009, DCWI filed a complaint against the valuation of Parcel No. E20-019998-0161 for the tax year 2008. The Montgomery County Auditor had assessed the property for purposes of the tax year 2008 as having a true value of $852,720 and a taxable value of $298,460. This was an increase of $52,750 from the previous valuation of $799,970.

{¶ 4} The property consists of a 1.455-acre parcel of land located about six miles north of the downtown Dayton business district, within Harrison Township. The site improvements include a two-story office building on a slab foundation, a three-story office building on a slab foundation, an asphalt parking area, trees, and greenspace. Both buildings were constructed in 1969 of average grade materials and workmanship and were in average condition at the time of the last increase in valuation. Neither building has an elevator. One

building has 9,656 square feet suitable for leasing, while the other contains 14,484 square feet, for a total leasing area of 24,140 square feet.

{¶ 5} In June 2009, the Dayton Board of Education ("BOE") filed a counter-complaint, asserting that the valuation should not change. The Montgomery County Board of Revision ("BOR") then held a hearing in September 2009, at which time DCWI presented limited testimony, documentation of actual income and expenses, and the appraisal report of Leland Coe, a certified real-estate appraiser. Neither the BOE nor the auditor presented testimony or evidence.

{¶ 6} In valuing the property, Coe rejected the cost approach because of the age of the structures. Based on the market approach and three allegedly comparable properties at 6300 North Main Street, 1612 Prosser Avenue, and 4517 Honeywell Court, Coe valued the property at $23 per square foot, for a total value of $555,220. At the hearing, Donald Wright briefly discussed the property at 6300 North Main, as well as two other comparable properties located at 4999 Northcutt Place and 249 Erdiel Drive that were for sale or had sold for approximately $22 per square foot.[1] The BOR was given some documentation about these properties that was not contained in Coe's appraisal.

{¶ 7} Coe's appraisal also valued the property using the income approach. Coe indicated that the unadjusted ranges for the several comparable properties ranged from a low of $11 per square foot to $13 per square foot. After making adjustments to each of the leases, Coe assigned an adjusted price for the property of between $11.34 and $12.34 per square foot.

---

[1] Wright's status was not identified at the hearing, but the auditor's property card indicates that the property was transferred by Donald C. Wright to the DCWI Office North, L.L.C. in 2004. No sales price was listed for the transfer.

Coe then gave the most weight to the middle of the range and used an adjusted rate of $12 per square foot. Coe then multiplied this figure by 20,507 square feet to arrive at a yearly gross income of $246,084. Using 24,140 square feet would have resulted in an annual gross income of $289,680.[2]

{¶ 8} Coe then projected a 15 percent vacancy and credit loss, which was the same vacancy rate as the majority of the properties in the area. This resulted in a deduction of $39,913 from the gross income figure, for an effective gross income of $209,171. From this amount, Coe deducted projected annual expenses (without real estate taxes) of $138,764, for a net operating income of $70,407. Using principles applicable to the income approach, Coe applied a capitalization rate of 13.38 percent, divided the operating income by that figure, and estimated a property value of $526,211, which he rounded down to $520,000.

{¶ 9} As noted, Coe used a lower square-footage figure than the total square feet in the buildings without explaining in the report why he chose that figure. If the larger square-footage figure (24,140) had been used, the final property valuation would have been $803,168. This equates to gross income of $289,680, minus the 15 percent vacancy rate of $43,452, which leaves $246,228 in effective gross income. Subtracting $138,764 in expenses from that amount, the net operating income would have been $107,464, and that amount divided by 13.38 percent is $803,168.

{¶ 10} Coe did not use the actual expense and income figures from the property. Those figures for the past five years were submitted to the BOR at the hearing and show

[2]The discrepancy in figures may have arisen because the lower level of one building was not completely finished. Coe indicated at the hearing that he included this area within the gross building area, even though it was only somewhat finished. The appraisal report also indicates that a minimal amount of rent was being asked for the basement ($100 per month) and the space was vacant.

steadily declining gross income between 2004 and 2008. Using the figures for the year ending on December 31, 2007, the total gross income was $226,622.90 (in contrast to 2004 gross income of $266,125.89). The actual vacancy rate was 31 percent, leaving an effective gross income of $156,369.80. The annual expenses, minus real estate taxes, were $114,541.43, which leaves a net operating income of $41,828.37. This amount divided by 13.38 percent yields a property valuation of $312, 619 (rounded up).

{¶ 11} If a 15 percent vacancy rate is used rather than the actual vacancy rate, the effective gross income would have been $192,689.46. Applying the rest of the formula would result in a property valuation of $583,618 (rounded up).

{¶ 12} At the BOR hearing, the county auditor's office indicated that it prefers to have actual income per square foot for office space, but if the county auditor does not have that, the market rate for the area is used. The county auditor had not previously asked for actual income and expenses when reappraising the property, nor had the owner offered these figures, because the owner was not informed that representatives of the county auditor's office had visited the property to reappraise it. The property owner did, however, provide actual income and expenses for the property at the hearing.

{¶ 13} The county auditor's office also indicated at the hearing that its model applies a vacancy rate of 12 percent and an expense rate of 43 percent. The auditor's commercial property card for the property indicates, however, that his office uses an approximate 12 percent downward adjustment to the gross income rate to arrive at the effective gross income, further downward adjustments of approximately 56.8 percent of the effective gross income to arrive at the net operating income, and a capitalization rate of 0.141500 to arrive at the

valuation of the property.

{¶ 14} If the BOR had applied these rates to the actual income of the property in 2007, the following results would have occurred: (1) Gross income of $226,622.90, (2) downward adjustment to gross income of 12 percent, or $27,194.75, to arrive at an effective gross income of $199,428.15, (3) downward adjustment of 56.8 percent of $199,428.15, to arrive at a net operating income of $113,275.19, (4) application of capitalization rate of 0.141500 to net operating income of $113,275.19, and (5) resulting valuation of $800,531.17.

{¶ 15} DCWI also presented evidence to the BOR of a decline in sales prices in the area during 2007 of approximately 6.5 percent, as well as evidence that a number of buildings in the area of the property were vacant or were declining in value. DCWI also testified about general depreciation of the neighborhood.

{¶ 16} After hearing the evidence, the BOR concluded, without supplying any reasoning, that the value of the property would remain unchanged, at $852,720. DCWI filed an administrative appeal under R.C. 5717.05 to the common pleas court, which considered the matter on the transcript from the BOR and the briefs of the parties. No additional evidence was presented.

{¶ 17} The trial court concluded that DCWI failed to meet its burden of producing sufficient evidence to warrant a reduction in value. The court based its decision on calculation errors, unsupported generalizations in Coe's income approach, and the failure of Coe's market approach to adjust for differences in size, age, and construction of the comparable properties.

{¶ 18} DCWI appeals from the judgment of the trial court affirming the valuation of

the BOR.

II

{¶ 19} DCWI's first assignment of error is as follows:

{¶ 20} "The trial court erred by failing to find that the auditor breached its duties under R.C. § 5713 et seq."

{¶ 21} Under this assignment of error, DCWI contends that the auditor failed to properly appraise the property, because he caused the property to be viewed only from the outside, did not obtain accurate information about the income generated, and used an unexplained "neighborhood model" that was based on unsupported guesswork.

{¶ 22} R.C. 5713.01(B) provides:

{¶ 23} "The auditor shall assess all the real estate situated in the county at its taxable value in accordance with sections 5713.03, 5713.31, and 5715.01 of the Revised Code and with the rules and methods applicable to the auditor's county adopted, prescribed, and promulgated by the tax commissioner. The auditor shall view and appraise or cause to be viewed and appraised at its true value in money, each lot or parcel of real estate, including land devoted exclusively to agricultural use, and the improvements located thereon at least once in each six-year period and the taxable values required to be derived therefrom shall be placed on the auditor's tax list and the county treasurer's duplicate for the tax year ordered by the commissioner pursuant to section 5715.34 of the Revised Code."

{¶ 24} The trial court concluded that the auditor is not required to inspect the interior of properties when performing appraisals. We agree with the trial court.

{¶ 25} R.C. 5713.01(B) does say that the auditor or its representative shall view the

real estate, including improvements, at least once in each six-year period. The statute does not, however, specifically state that the auditor must inspect the interior of the property. R.C. 5713.03 also requires the county auditor to determine the true value of property from "the best sources of information available." Viewing the interior of the premises is one source of information about the condition of the property and could be helpful in establishing value. Again, however, the statute does not specifically state that the interior must be viewed.

{¶ 26} Ohio Adm.Code Chapter 5703-25 contains various regulations that supplement the statutes. For example, Ohio Adm.Code 5703-25-06(A) provides that the auditor should determine the "true value in money" of property, after considering:

{¶ 27} "[A]ll facts tending to indicate the current or fair market value of the property including, but not limited to, the physical nature and construction of the property, its adaptation and availability for the purpose for which it was acquired or constructed or for the purpose for which it is or may be used, its actual cost, the method and terms of financing its acquisition, its value as indicated by reproduction cost less physical depreciation and all forms of obsolescence if any, its replacement cost, and its rental income-producing capacity, if any. The assessor shall likewise take into consideration the location of the property and the fair market value of similar properties in the same locality."

{¶ 28} Ohio Adm.Code 5703-25-06(B) also requires the auditor to conduct reappraisals of property at least once during every six-year period. With regard to these reappraisals, Ohio Adm.Code 5703-25-07(B) states that land shall be appraised in accordance with Ohio Adm.Code 5703-25-11. Similarly, Ohio Adm.Code 5703-25-07(C) states that buildings are to be appraised in accordance with Ohio Adm.Code 5703-25-12. Significantly,

Ohio Adm.Code 5307-25-12(C) states as follows:

{¶ 29} "Building inspection – Each building shall be measured to determine the number of square or cubic feet it contains, and a sketch shall be drawn on the property record card. Major buildings such as dwellings and barns shall be sketched on the property record card with other minor buildings to be numbered, the number encircled to appear in the space for the sketch of buildings in its proper relation to the dwelling and barn, etc.

{¶ 30} "The exterior, and *if possible*, the interior of each building shall be inspected with notations being made on the record card of construction features, physical conditions, and other factors that would affect value. Each building shall be graded according to quality of construction." (Emphasis added.)

{¶ 31} Thus, the administrative regulations provide only that interior inspection is desirable; it is not required. In the case before us, the property card indicates that the buildings were last entered and information was gained in 1995 from a tenant. The property card also states that an entry in May 2007 was unsuccessful, because the occupant was "not home."

{¶ 32} At the BOR hearing, witnesses were sworn, but the transcript of the hearing does not generally specify the particular speaker's name. Some individuals are self-identifying because they stated their names or through the context of their remarks.

{¶ 33} An individual who identified himself as a "tenant" stated that to his knowledge, no one from the auditor's office had asked to enter the buildings. DCWI representatives also indicated that the buildings are open from 7 a.m. to 7 p.m. and there was no record of anyone from the auditor's office having come to view the premises.

{¶ 34} The fact that DCWI or one tenant was not specifically aware of an attempt to view the property is irrelevant. A more effective practice may have been to leave notice of the attempt and ask the property owner to schedule an inspection, if desired. See *State ex rel. Holcomb v. Wurst* (1989), 63 Ohio App.3d 629 (auditor left information at the premises and asked property owners to call for an inspection). Nonetheless, the regulations require the auditor only to view the premises if possible, and the record indicates that the auditor did make an attempt.

{¶ 35} DCWI also challenges the auditor's analysis because the auditor used a generalized "neighborhood model" that was based on unsupported guesswork and did not obtain actual income information about the property. The trial court rejected this claim, noting that DCWI's own appraiser, Coe, did not use the property's actual income as a basis for his opinion but used comparable properties to arrive at annual income. We agree with the trial court that Coe's report did not use actual income. However, we also conclude that the BOR was provided with actual income and expenses, which the auditor's representative said would be the auditor's preferred information for valuing the property. Inexplicably, the BOR and trial court failed to consider this evidence.

{¶ 36} Ohio Adm.Code 5703-25-07(D) provides that in estimating the true value of property, a county auditor may consider any of the three recognized approaches to value: the market-data approach, the income approach, or the cost approach. Market data is most applicable to properties that are sold often, and the cost approach is generally difficult to apply in situations involving older or obsolete buildings. Ohio Adm.Code 5703-25-07(D)(1) and (3).

{¶ 37} DCWI's buildings had not been sold since 1985, and the buildings were also older in nature, having been constructed in 1969. Therefore, the income approach would have been most appropriate. Regarding the income approach, Ohio Adm.Code 5703-25-07(D)(2) provides:

{¶ 38} "The value is estimated by capitalizing the net income after expenses, including normal vacancies and credit losses. While the contract rental or lease of a given property is to be considered the current economic rent should be given weight. Expenses should be examined for extraordinary items. In making appraisals by the income approach for tax purposes in Ohio, provision for expenses for real property taxes should be made by calculating the effective tax rate in the given tax district as defined in paragraph (E) of rule 5703-25-05 of the Administrative Code, and adding the result to the basic interest and capitalization rate. Interest and capitalization rates should be determined from market data allowing for current returns on mortgages and equities. The income approach should be used for any type of property where rental income or income attributed to the real property is a major factor in determining value. The value should consider both the value of the leased fee and the leasehold."

{¶ 39} The county auditor's office indicated in the hearing that it uses the income approach to value. The county auditor's office also stated that it prefers to use actual income per square foot, but if that information is not available, the market value for the area would be used. At the hearing, DCWI questioned the validity of the auditor's "neighborhood model," which was based on a vacancy rate of 12 percent and expenses of 43 percent. This resulted in attribution of a net operating income of $120,660 to the property. That net operating income

is significantly above the net operating income of the property in 2007, as shown by the actual expenses and income. As was noted above, using the actual income and expenses results in valuation between $312,619 and $583,618, depending on the vacancy and loss rate applied. Even if the BOR and trial court had used the county auditor's own model for valuation, a reduction in value would still have been warranted. Accordingly, we conclude that the trial court erred in rejecting DCWI's claim that the actual income figures should have been used.

**{¶ 40}** The auditor did not err in failing to ask DCWI for actual income figures at the time of the inspection, nor did DCWI fail in its burden by not anticipating that the auditor might like to have these figures at the time of the reappraisal. The auditor was conducting a mass appraisal, and DCWI was not aware that the auditor had visited its premises. Therefore, neither party was at fault in not initially relying on actual-income-and-expense figures.

**{¶ 41}** Nonetheless, based on the county's representation that actual-income figures are preferred, the BOR and trial court should have taken those figures into consideration. Accordingly, the trial court erred in concluding that DCWI's argument about actual-income figures was baseless. DCWI met its burden of presenting probative evidence that the value of its property was an amount other than the value determined by the county. *Fogg-Akron Assoc., L.P. v. Summit Cty. Bd. of Revision,* 124 Ohio St.3d 112, 2009-Ohio-6412, ¶ 16.

**{¶ 42}** DCWI's first assignment of error is sustained.

III

**{¶ 43}** DCWI's second assignment of error is as follows:

**{¶ 44}** "The trial court erred by disallowing the appraisal of Mr. Coe and failing to conduct a hearing as to valuation."

**{¶ 45}** Under this assignment of error, DCWI contends that the trial court erred by disallowing Coe's appraisal and by failing to conduct a hearing on valuation.    The trial court concluded that insufficient evidence had been presented, because Coe's market approach failed to address differences in size, age, and construction of comparable properties.  The court also held that Coe's income approach had calculation errors and used an unsupported generalization about using an income figure of $11.34 to $12.34 per square feet after making adjustments for leases.

**{¶ 46}** In *Black v. Bd. of Revision of Cuyahoga Cty.* (1985), 16 Ohio St.3d 11, the Ohio Supreme Court outlined the standards for appeals of decisions of boards of revision:

**{¶ 47}** "R.C. 5717.05 does not require a trial *de novo* by courts of common pleas on appeals from decisions of county boards of revision.  The court may hear the appeal on the record and evidence thus submitted, or, in its discretion, may consider additional evidence.  The court shall independently determine the taxable value of the property whose valuation or assessment for taxation is complained of, or, in the event of discriminatory valuation, shall determine a valuation that corrects such discrimination.  The judgment of the trial court shall not be disturbed absent a showing of abuse of discretion."  Id. at paragraph one of the syllabus.

**{¶ 48}** An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' "  *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.  The Ohio Supreme Court noted in *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, 161, that most abuses of discretion result in

decisions that are unreasonable, rather than arbitrary or unconscionable.

{¶ 49} We also note that "[u]pon review, neither the property valuation by a board of revision nor an auditor's appraisal is entitled to a presumption of validity. * * *  Nevertheless, a taxpayer has the initial burden and obligation to prove the right to a reduction when challenging a county auditor's valuation. * * *  A taxpayer is 'not entitled to the deduction claimed merely because no evidence is adduced contra his claim.' "  *Murray & Co. Marina, Inc. v. Erie Cty. Bd. of Revision* (1997), 123 Ohio App.3d 166, 172, quoting *W. Indus., Inc. v. Hamilton Cty. Bd. of* Revision (1960), 170 Ohio St. 340, 342.  Also, the common pleas court does not have to accept the valuation of any witness and has wide discretion to weigh the evidence and determine credibility of witnesses.  Id. at 173.[3]  However, "[w]hether reliable and probative evidence exists in the record is itself a legal conclusion for this court's determination."  *Blatt v. Hamilton Cty. Bd. of Revision*, 123 Ohio St.3d 428, 2009-Ohio-5260, ¶ 14 (noting that an appellate court—in that case, the Supreme Court of Ohio—has the right to decide legal conclusions).

{¶ 50} In the case before us, the trial court acted outside its discretion when it failed to consider the evidence of actual income and expenses that was submitted to the BOR.  The county auditor's office itself indicated that it prefers this data, and a reduction in value was warranted, even if the county auditor's own income-approach criteria are applied.  Again, using the actual income and expenses results in valuation between $312,619 and $583,618,

---

[3] Comments about determining credibility and weighing evidence, while appropriate for most situations when the trial court is the fact-finder, are of questionable validity when the record, as here, is the same in both the trial and appellate courts.  Applying an abuse-of-discretion standard also seems illogical when trial and appellate courts review the same documents and the trial court has not taken live testimony.  Nonetheless, these are the standards, and we apply them.

depending on the vacancy and loss rate applied. Even if the BOR and trial court had used the county auditor's own model for valuation, a reduction in value would still have been warranted, since the figure produced by that model was well below the current valuation.

{¶ 51} We also note that the trial court did not fault Coe's income analysis, other than the calculation error in using a smaller number of square feet, and Coe's generalization about the adjusted market prices of $11.34 per square foot to a high of $12.34 per square foot (gross). The trial court observed that the latter comment was a generalized statement of little assistance, because details of the adjustment were not given. In view of the fact that the county auditor's office itself stated that it prefers to use actual-income figures, comparable square foot rates are not particularly relevant to the analysis.

{¶ 52} Even if these comparable rates were relevant, evidence was presented at the hearing that average sales prices and average sales depreciation in the area were down 6.52 percent and 10.44 percent, respectively, for the year 2007 and that a number of buildings in the area were in decline or were vacant.

{¶ 53} In light of the above facts, the trial court abused its discretion by failing to consider evidence of actual income and expenses submitted to the BOR. When the auditor's office itself indicated a preference for using actual income in its calculation, the trial court should have considered that evidence in calculating the valuation of the property. DCWI met its burden of presenting probative evidence that the value of its property was an amount other than the value determined by the county. *Fogg-Akron Assoc., L.P.*, 2009-Ohio-6412, ¶ 16.

{¶ 54} DCWI's second assignment of error is sustained.

IV

{¶ 55} Both of DCWI's assignments of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.